UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

MICHAEL SMITH,

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SEALED INDICTMENT**

24 Cr. ( )

**24CRIM 504**

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

### Overview

1.  From approximately 2017, up to and including 2024, MICHAEL SMITH, the defendant, orchestrated a scheme to steal millions of dollars of musical royalties by fraudulently inflating music streams on digital streaming platforms (the "Streaming Platforms"), such as Amazon Music, Apple Music, Spotify, and YouTube Music. SMITH purchased from a coconspirator hundreds of thousands of songs that were created through artificial intelligence ("AI") and then uploaded to the Streaming Platforms. SMITH then used "bots"—automated programs—to stream the AI-generated songs billions of times. At the height of his fraudulent scheme, SMITH used over a thousand bot accounts simultaneously to artificially boost streams of his music across the Streaming Platforms. By manipulating the streaming data in this manner, SMITH fraudulently obtained more than $10 million in royalty payments to which he was not entitled.

## The Music Streaming Industry

2.   At all times relevant to this Indictment, individuals could stream music through music streaming platforms such as Amazon Music, Apple Music, Spotify, and YouTube Music (*i.e.*, the Streaming Platforms). Each time a song is streamed through one of the Streaming Platforms, the songwriter who composed the song, the musician who performed it, and in certain cases other rights holders, are entitled to small royalty payments. The exact amount of the royalty payments owed varies depending on a number of factors, but it is often less than one cent per stream.

3.   The funds used to pay royalties to songwriters, composers, lyricists, and music publishers (the "Songwriters") are obtained from the Streaming Platforms. Generally, the Streaming Platforms are required to pay a certain percentage of their revenues (the "Revenue Pool") to Performance Rights Organizations ("PROs"), for the right to publicly perform songs (known as performance royalties), and to the Mechanical Licensing Collective (the "MLC"),[1] for the right to digitally reproduce and distribute songs (known as digital mechanical royalties). The Streaming Platforms also send data on streaming activity along with the Revenue Pool, which is then used by the PROs and the MLC (collectively, the "Rights Organizations") to proportionally allocate and disperse payments from the Revenue Pool to the Songwriters whose songs were streamed during the same period that the Streaming Platforms earned the revenue. As a result, streaming fraud diverts funds from Songwriters whose songs were legitimately streamed by real consumers to those who use automation to falsely create the appearance of legitimate streaming.

---

[1] The MLC is a nonprofit organization designated by the U.S. Copyright Office pursuant to the Music Modernization Act of 2018, Pub. L. No. 115-264, 132 Stat. 3676 (2018). The MLC collects digital mechanical royalties from the Streaming Platforms and distributes them to the Songwriters.

4. The funds used to pay royalties to performing artists, record companies, or other sound recording distributors ("Artists") are also obtained from the Streaming Platforms. Like songwriter royalties, Streaming Platforms are generally required to pay a pool of royalties to Artists for the right to stream the sound recordings that embody musical compositions. This sound recording royalty pool is also often calculated as a certain percentage of Streaming Platform revenues, and the royalty pool is then allocated proportionally among Artists based on their respective percentages of total streams. These allocated royalty funds are then paid directly by Streaming Platforms to Artists (through the record companies and music distribution companies). Streaming fraud thus diverts sound recording royalties away from Artists whose sound recordings were legitimately streamed by real consumers, in the same way that streaming fraud diverts musical composition royalties away from Songwriters.

5. As alleged herein, MICHAEL SMITH, the defendant, made false and misleading statements to the Streaming Platforms, Rights Organizations, and certain companies that facilitate the distribution of artists' music to the Streaming Platforms. As described below, those lies were repeated and varying but all were intended to promote and conceal his massive streaming manipulation fraud. As a result of his false and misleading statements, SMITH fraudulently obtained millions of dollars in royalty payments from the Streaming Platforms, Rights Organizations, and music distribution companies. Those funds ultimately should have been paid to the Songwriters and Artists whose works were streamed legitimately by real consumers.

**Streaming Fraud is Prohibited by the Streaming Platforms,
Music Distribution Companies, and Rights Organizations**

6. The Streaming Platforms generally prohibit streaming manipulation in their terms of service. For example, at relevant times to this Indictment, one of the Streaming Platform's ("Streaming Platform-1") that MICHAEL SMITH, the defendant, distributed his songs to had User

3

Guidelines that prohibited, "artificially increasing play counts or follow counts, artificially promoting Content, or other manipulation including by (i) using any bot, script, or other automated process."

7. Likewise, music distribution companies, which facilitate the distribution of artists' music to the Streaming Platforms, also prohibit streaming fraud. For example, at relevant times to this Indictment, a Manhattan-based music distribution company ("Distribution Company-1") used by MICHAEL SMITH, the defendant, to distribute his songs to Streaming Platforms required customers, such as SMITH, to "agree not to engage in (or to permit, encourage, enlist, retain, or employ third parties to engage in), activities that, in [Distribution Company-1]'s sole discretion, constitute Streaming Manipulation." Distribution Company-1's terms of service define streaming manipulation as "any activity and/or method which involves the artificial creation, by human or non-human means, of online or offline plays on audio and/or audio-visual streaming services, where such plays do not represent bona fide end-user listening and/or views initiated by genuine consumers and taking place in the reporting country."

8. Similarly, at relevant times to this Indictment, a Florida-based music distribution company ("Distribution Company-2") used by SMITH to distribute his songs to the Streaming Platforms required customers, such as SMITH, to "represent and warrant" that they would not engage in "so-called 'illegal boosting,' 'fraudulent streaming,' or juicing' activities or any similar activities designed to artificially inflate the amount of streams, transmissions, impressions, plays, views, engagements, [or] other exploitations in respect of Client Content, including, without limitation via the use of bots [or] any other method of fabricating, manipulating, artificially increasing . . . the amount or number of streams . . . for any Client Content." On or about March

3, 2023, SMITH falsely represented to Distribution Company-2 that he would not engage in fraudulent streaming.

9. The Rights Organizations generally prohibit streaming manipulation. Indeed, the mission of the MLC is to ensure that Songwriters receive their mechanical royalties from streaming and download services accurately.[2] As alleged herein, MICHAEL SMITH, the defendant, and individuals working on his behalf repeatedly lied to the MLC about SMITH's streaming manipulation in order to fraudulently obtain royalty payments to which SMITH was not entitled.

### SMITH's Music Streaming Manipulation Scheme

10. The music streaming fraud proceeded in three stages. First, MICHAEL SMITH, the defendant, created thousands of accounts on the Streaming Platforms (the "Bot Accounts") that he could use to stream songs. Second, SMITH used software to cause the Bot Accounts to continuously stream songs that he owned. Third, SMITH collected royalties based on the fraudulent streams by the Bot Accounts.

11. MICHAEL SMITH, the defendant, used the following methods to create the Bot Accounts:

   a. SMITH obtained thousands of email accounts (the "Fake Email Accounts") that he used to create and register the Bot Accounts. SMITH typically purchased the Fake Email Accounts from vendors who sold bulk email accounts. The Fake Email Accounts were often in the names of fictitious identities.

---

[2] The federal regulations that govern the MLC's distribution of digital mechanical royalties provide that manipulated streams are not eligible for royalties. *See* 37 C.F.R. §§ 385.2, 385.21.

      b.     SMITH then used the Fake Email Accounts to create and register the Bot Accounts on the Streaming Platforms. SMITH typically registered the Bot Accounts in fake names corresponding to the Fake Email Accounts.

      c.     At certain points, SMITH had as many as 10,000 active Bot Accounts on the Streaming Platforms. Signing up such a voluminous number of Bot Accounts on the Streaming Platforms was labor-intensive, and SMITH paid individuals located abroad as well as coconspirators located in the United States to do the data entry work of signing up for the Bot Accounts. For example, in a May 11, 2017 email to a coconspirator ("CC-1"), SMITH asked CC-1 to create Bot Accounts on a particular Streaming Platform: "Make up names and addresses[.] [J]ust make sure they all are the same for family member and also make sure everyone is over 18."

      d.     To maximize the streams by the Bot Accounts, SMITH typically paid for "family plans" on the Streaming Platforms, which are intended for members of the same family living in the same household and are the most economical way to purchase multiple accounts on the Streaming Platforms, since family plans typically cost less per user than individual plans.

      e.     SMITH paid for the Bot Accounts, typically using proceeds generated by his fraudulent scheme. In order to make it appear as if each Bot Account (or group of Bot Accounts within a single family plan) used a different source of payment, SMITH used a Manhattan-based service ("Financial Service-1") that provided large numbers of debit cards, typically corporate debit cards for employees of a company. SMITH lied to Financial Service-1 and provided it with dozens of fake names corresponding to the Fake Email Accounts and Bot Accounts, claiming that those fake names belonged to employees of his company. SMITH used more than $1.3 million in fraudulently obtained royalties to fund the debit cards so that they could be used to purchase the Bot Accounts and promote his fraudulent scheme. Specifically, in multiple transactions from

approximately 2020 through 2023, SMITH transferred $1.3 million in fraudulently obtained royalties to a bank account he controlled at a U.S.-based financial institution in the name of SMH Entertainment, and then transferred the proceeds to Financial Service-1 in order to fund debit cards for the Bot Accounts.

12. After registering the Bot Accounts, MICHAEL SMITH, the defendant, then caused the Bot Accounts to continuously stream songs he owned using the following methods:

  a. SMITH used cloud computer services so that he could use many virtual computers at the same time.

  b. SMITH used some of the Bot Accounts on each virtual computer at the same time. SMITH typically used the web players for each of the Streaming Platforms, and had a number of Bot Accounts simultaneously streaming music on separate tabs in internet browsers on the virtual computers.

  c. SMITH purchased—and subsequently modified—"macros," or small pieces of computer code that automatically continuously played the music for him.

13. MICHAEL SMITH, the defendant, then obtained millions of dollars in royalties based on the artificially inflated streams of his music.

14. On October 20, 2017, MICHAEL SMITH, the defendant, emailed himself a financial breakdown of how many streams he was generating each day and the corresponding royalty amounts. In the email, SMITH wrote, in substance and in part, that he had 52 cloud services accounts, and each of those accounts had 20 Bot Accounts on the Streaming Platforms, for a total of 1,040 Bot Accounts. He further wrote that each Bot Account could stream approximately 636 songs per day, and so in total SMITH could generate approximately 661,440 streams per day. SMITH estimated that the average royalty per stream was half of one cent, which

would have meant daily royalties of $3,307.20, monthly royalties of $99,216, and annual royalties of $1,207,128.

### SMITH's Efforts to Conceal His Fraudulent Scheme

15. MICHAEL SMITH, the defendant, was aware that the Streaming Platforms would shut down his Bot Accounts if they learned that he was fraudulently streaming music. SMITH therefore took steps to conceal his scheme and to evade the Steaming Platforms' fraud detection and prevention systems:

   a. As described above, SMITH used false names to sign up for the Bot Accounts and used debit cards in false names to pay for the Bot Accounts.

   b. SMITH caused the Bot Accounts to log in to the platforms using different virtual private networks ("VPNs") to conceal the fact that the Bot Accounts were all operating from SMITH's home.

   c. SMITH directed his coconspirators that the Bot Accounts and macros be "Unde[te]ctable: At least put every safety measure in to avoid detection."

   d. SMITH spread his automated streams across thousands of songs to avoid anomalous streaming as to any single song. SMITH was aware that if, for example, a single song was streamed one billion times, it would raise suspicions at the Streaming Platforms and the music distribution companies that those streams were the result of streaming manipulation. A billion fake streams spread across tens of thousands of songs, however, would be more difficult to detect, because each song would only be streamed a couple of times. As a result, SMITH repeatedly identified the need for more songs as crucial for facilitating the fraud scheme. For example:

        i.        On or about October 4, 2018, SMITH emailed two coconspirators that, "in order to not raise any issues with the powers that be we need a TON of content with small amounts of Streams."

        ii.        On or about December 26, 2018, SMITH emailed two coconspirators that, "We need to get a TON of songs fast to make this work around the anti fraud policies these guys are all using now."

        iii.        On or about May 9, 2019, SMITH emailed a coconspirator that, "I can't run the bots without content. And I need enough content so I don't overrun each song. That's the problem. If we get too many streams on one song it comes down."

### SMITH Turns to Artificial Intelligence to Expand the Fraud Scheme

16.    To successfully execute the streaming fraud scheme, MICHAEL SMITH, the defendant, needed access to a large volume of songs. Although SMITH was himself a musician and had access to a small catalog of music that he owned, that catalog was not nearly large enough for SMITH's streaming fraud. As explained below, SMITH needed to own far more songs for his scheme to generate meaningful illicit proceeds.

17.    MICHAEL SMITH, the defendant, attempted several strategies to obtain enough music to operate his fraudulent scheme. Early in the scheme, SMITH used the catalog of a music publicist ("CC-2") to fraudulently generate royalty payments. Later, SMITH attempted to sell his fraudulent streaming scheme as a service, in which other musicians would pay him for streams he would fraudulently generate or share royalties with him in exchange for fraudulent streams of their music. But neither strategy allowed SMITH to gain access to the massive volume of songs the scheme needed in order to evade detection and succeed on a large scale.

18. MICHAEL SMITH, the defendant, eventually turned to artificial intelligence to expand his fraudulent scheme, and in turn, his illicit proceeds. In or about 2018, SMITH began working with the Chief Executive Officer of an AI music company ("CC-3") and a music promoter ("CC-4") to create hundreds of thousands of songs using artificial intelligence that SMITH could then fraudulently stream.

19. MICHAEL SMITH, the defendant, began manipulating the streams of AI-generated music in or about October 2018. CC-4 described the initial streams of the AI music as "proof of concept." SMITH reported that as of October 18, 2018, he had generated hundreds of thousands of streams of the AI music, and CC-4 replied, "we've proved the model works."

20. CC-3 soon began providing MICHAEL SMITH, the defendant, with thousands of songs each week that SMITH could upload to the Streaming Platforms and manipulate the streams for. In a March 11, 2019 email to SMITH, CC-3 explained what kind of music he was sending to SMITH as part of the scheme: "Keep in mind what we're doing musically here... this is not 'music,' it's 'instant music' ;)."

21. By June 5, 2019, MICHAEL SMITH, the defendant, reported to CC-3 and CC-4 that, "We are at 88 million TOTAL STREAMS so far!!!" SMITH further explained that his fraudulent streams were earning approximately $110,000 per month, and that CC-3 and CC-4 were each receiving 10% of those fraud proceeds. Finally, SMITH asked CC-3 to provide him with another 10,000 AI songs so he could "spread this out more" with his streams in order to evade detection by the Streaming Platforms.

22. On or about February 1, 2019, MICHAEL SMITH, the defendant, and CC-3 entered into a "Master Services Agreement" in which CC-3's AI music company agreed to provide SMITH with between 1,000 to 10,000 songs each month; they further agreed that SMITH would

have full ownership of the intellectual property rights in the songs. SMITH, in turn, agreed to provide metadata—meaning, among other things, song and artist names to attach to the songs—and to pay CC-3's company each month the greater of $2,000 or 15% of the streaming revenue he generated from the AI songs.

23. CC-3 ultimately provided MICHAEL SMITH, the defendant, with hundreds of thousands of AI songs for which he could manipulate the streams. CC-3's songs were typically given file names that were a randomized list of letters and numbers, such as "n_7a2b2d74-1621-4385-895d-b1e4af78d860.mp3." SMITH then created randomly generated song and artist names for audio files so that they would appear to have been created by real artists rather than artificial intelligence. For example:

a. An alphabetically consecutive selection of 25 of the names of the AI songs SMITH used is as follows: "Zygophyceae," "Zygophyllaceae," "Zygophyllum," "Zygopteraceae," "Zygopteris," "Zygopteron," "Zygopterous," "Zygosporic," "Zygotenes," "Zygotes," "Zygotic," "Zygotic Lanie," "Zygotic Washstands," "Zyme Bedewing," "Zymes," "Zymite," "Zymo Phyte," "Zymogenes," "Zymogenic," "Zymologies," "Zymoplastic," "Zymopure," "Zymotechnical," "Zymotechny," and "Zyzomys."

b. An alphabetically consecutive selection of 25 of the names of the "artists" of the AI songs SMITH used is as follows: "Calliope Bloom," "Calliope Erratum," "Callous," "Callous Humane," "Callous Post," "Callousness," "Calm Baseball," "Calm Connected," "Calm Force," "Calm Identity," "Calm Innovation," "Calm Knuckles," "Calm Market," "Calm The Super," "Calm Weary," "Calms Scorching," "Calorie Event," "Calorie Screams," "Calvin Mann," "Calvinistic Dust," "Calypso Xored," "Camalus Disen," "Camaxtli Minerva," "Cambists Cagelings," and "Camel Edible."

11

24.     The AI technology that CC-3 used to generate AI songs for MICHAEL SMITH, the defendant, improved over time, making it less likely that the Streaming Platforms would detect the scheme. For example, in an August 17, 2020 email, CC-3 wrote to SMITH, "Song quality is 10x-20x better now, and we also have vocal generation capabilities. . . . Have a listen to the attached for an idea of what I'm talking about."

25.     MICHAEL SMITH, the defendant, caused hundreds of thousands of AI songs to be streamed by his Bot Accounts billions of times, which allowed him to fraudulently obtain more than $10 million in royalties. In a February 2024 email, SMITH boasted that his "existing music has generated at this point over 4 billion streams and $12 million in royalties since 2019."

### SMITH's Lies to Facilitate the Fraud Scheme

26.     MICHAEL SMITH, the defendant, made numerous misrepresentations to the Streaming Platforms in furtherance of the fraud scheme. For example, SMITH repeatedly lied to the Streaming Platforms when he used false information to create the Bot Accounts and when he agreed to abide by terms and conditions that prohibited streaming manipulation. SMITH also deceived the Streaming Platforms by making it appear as if legitimate users were in control of the Bot Accounts and streaming music when, in fact, the Bot Accounts were hard-coded to stream SMITH's music billions of times. SMITH also caused the Streaming Platforms to falsely report billions of streams of his music, even though SMITH knew that those streams were in fact caused by the Bot Accounts rather than real human listeners.

27.     In addition, as described herein, MICHAEL SMITH, the defendant, lied directly to certain entities involved in streaming music, distributing music, or paying out royalties—including explicit denials that he was manipulating streaming activity. For example, on or about March 6, 2018, Distribution Company-1 informed MICHAEL SMITH, the defendant, that one of his songs

"fit the criteria that is usually linked to store end streaming abuse." SMITH responded, "I acknowledge what you wrote and I ask that you still release it. We have no intentions of committing streaming fraud." Later that same year, in or about October 2018, Distribution Company-1 advised SMITH that it had received "multiple reports of streaming abuse from different stores" and, as a result, planned to remove SMITH's releases from all stores. Distribution Company-1 further advised SMITH, "engaging in fraudulent activity, including artificially increasing your stream counts in stores (commonly known as "streaming abuse"), is a violation of [Distribution Company-1's] Terms of Service." In response, SMITH once again lied about his streaming fraud, claiming: "This is absolutely wrong and crazy! . . . There is absolutely no fraud going on whatsoever! How can I appeal this?"

28. As another example, in or about March 2019, Streaming Platform-1 informed a music distribution company ("Distribution Company-3") that MICHAEL SMITH, the defendant, was working with, that Streaming Platform-1 believed SMITH had engaged in streaming fraud. When told of Streaming Platform-1's determination, SMITH falsely told Distribution Company-3, "I have done NOTHING to artificially inflate the streams on my two albums. . . . I have not a done a thing to illegally stream my music. . . . I have not violated the terms of my agreement with you at all and you have provided no proof either. I have not illegally streamed my music."

29. Shortly thereafter, MICHAEL SMITH, the defendant, communicated directly with Streaming Platform-1 to deny that he was engaged in streaming fraud and demand that Streaming Platform-1 reinstate his music. SMITH wrote, "I need to see some proof as to why you are claiming I had artificial Streams? You have slandered me to my distributors claiming I've had fraudulent streams, however you have provided no proof to this claim, you have provided me no chance to defend myself, and you have withheld money that is owed to me. I am asking for you

to provide me with the documentation of what you feel was done artificially. I have never done anything to artificially inflate my streams. I have worked with promotion companies who claim to be legitimate." Those statements were false. As SMITH well knew, he had artificially streamed his music over and over again. SMITH made these false statements in an attempt to convince Streaming Platform-1 to reinstate his music so that he could continue fraudulently obtaining royalties.

      30.    In or about March and April 2023, the MLC halted royalty payments to MICHAEL SMITH, the defendant, and confronted SMITH about his fraud. In response, SMITH and representatives acting on his behalf repeatedly lied to the MLC in an attempt to obtain the royalty payments. For example:

      a.    On or about March 17, 2023, a representative of SMITH's wrote the following to the MLC, "I asked for any proof of 'play manipulation.' Not only did [two MLC employees] refuse to provide any documentation of proof, but [an MLC employee] repeatedly suggested I ask Mike Smith. I have asked Mike. Mike categorically denies any play manipulation."

      b.    On or about March 23, 2023, a representative of SMITH's wrote the following to the MLC, "[Another SMITH representative] and [an MLC employee] spoke yesterday. [The SMITH representative] explained to [the MLC employee] how Mike is able to compose and record music so quickly. [The SMITH representative] also confirmed that none of Mike's works are computer-generated creations. Mike is the 'human' author! . . .. As Mike, [the SMITH representative] and I have explained in our previous communications, Mike utilizes third-party music promoters to create awareness for his product and drive traffic to his releases. These same promoters work with the major labels and their artists. . . There is no question that these

promoters (again, the same ones engaged by the majors) only engage in legitimate, approved, industry standard practices . . ."

   c. On or about April 27, 2023, a representative of SMITH's wrote the following to the MLC, "We have clearly demonstrated that Mike Smith's works are not AI-generated, but rather they are human-authored." Those statements were false. As SMITH well knew, he (i) manipulated the streams of his music, (ii) used AI to generate the music, and (iii) was personally responsible for the streams of his music via the Bot Accounts.

## STATUTORY ALLEGATIONS

  31. From at least in or about 2017 through at least in or about 2024, in the Southern District of New York and elsewhere, MICHAEL SMITH, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

  32. It was a part and an object of the conspiracy that MICHAEL SMITH, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SMITH made misrepresentations in connection with a scheme to artificially inflate streaming data in order to fraudulently obtain royalties, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

33. The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

34. From at least in or about 2017 through at least in or about 2024, in the Southern District of New York and elsewhere, MICHAEL SMITH, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, SMITH made misrepresentations in connection with a scheme to artificially inflate streaming data in order to fraudulently obtain royalties, and sent and received, and caused others to send and receive, emails and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Money Laundering Conspiracy)

The Grand Jury further charges:

35. The allegations contained in paragraphs 1 through 30 of this Indictment are repeated and realleged as if fully set forth herein.

36. From at least in or about 2017, through at least in or about 2024, in the Southern District of New York and elsewhere, MICHAEL SMITH, the defendant, and others known and

unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

37. It was a part and an object of the conspiracy that MICHAEL SMITH, the defendant, and others known and unknown, with the intent to promote the carrying on of specified unlawful activity, to wit, a scheme to commit wire fraud, in violation of Title 18 United States Code, Section 1343, as charged in Count Two of the Indictment, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, and which in fact involved the proceeds of specified unlawful activity, to wit, SMITH used proceeds generated by the wire fraud scheme charged in Count Two of the Indictment to pay for Bot Accounts.

(Title 18, United States Code, Section 1956(h).)

**FORFEITURE ALLEGATIONS**

38. As a result of committing the wire fraud offenses alleged in Counts One and Two of this Indictment, MICHAEL SMITH, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

39. As a result of committing the money laundering offense alleged in Count Three of this Indictment, MICHAEL SMITH, the defendant, shall forfeit to the United States, pursuant to

Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

### Substitute Assets Provision

40. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third person;

    (c) has been placed beyond the jurisdiction of the Court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____  
FOREPERSON

*Damian Williams*  
DAMIAN WILLIAMS  
United States Attorney